**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT A. STOKES, individually and
as representative of all similarly
situated former employees of West-
inghouse Savannah River Company,
<u>Plaintiff-Appellant,</u>

v.

WESTINGHOUSE SAVANNAH RIVER

COMPANY,
<u>Defendant-Appellee,</u>

No. 99-1543

CHRISTOPHER GEORGE CHRISTOS;
ROBERT L. BAILEY; JAMES M. POPE;
LORIN W. ROSS; ALAN M.
SCHWARTZMAN; GEORGE A. KRIST;
JAMES O. SLOAN; MICHAEL COHEN,
<u>Movants-Appellants.</u>

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Charles E. Simons, Jr., Senior District Judge.
(CA-97-2780-6-1)

Argued: January 26, 2000

Decided: March 14, 2000

Before NIEMEYER, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Frederic N. SMALKIN, United States District Judge for
the District of Maryland, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Niemeyer wrote the opinion, in which Senior Judge Hamilton
and Judge Smalkin joined.

**COUNSEL**

**ARGUED:** Richard E. Miley, North Augusta, South Carolina, for
Appellants. Steven Mark Wynkoop, NELSON, MULLINS, RILEY &
SCARBOROUGH, L.L.P., Greenville, South Carolina, for Appellee.
**ON BRIEF:** William H. Foster, NELSON, MULLINS, RILEY &
SCARBOROUGH, L.L.P., Greenville, South Carolina, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Upon his 1996 layoff from Westinghouse Savannah River Com-
pany as part of a reduction in force, Robert A. Stokes was provided
an option to receive a lump-sum severance payment or a special
retirement option, but not both. After electing the special retirement
option, Stokes filed this action, contending that he was illegally
denied a severance benefit in violation of the Age Discrimination in
Employment Act of 1967 ("ADEA"), as amended by the Older Work-
ers Benefits Protection Act ("OWBPA"), and the Employee Retire-
ment Income Security Act ("ERISA"). He also contends that Westing-
house Savannah River Company selected him for layoff in part
because of his age, in violation of the ADEA.

The district court granted summary judgment to Westinghouse
Savannah River Company on all of Stokes' claims. Because we con-
clude that the option presented to Stokes to elect receipt of either sev-
erance pay _or_ the special retirement option was legal, we affirm the
district court's summary judgment denying Stokes a severance bene-
fit. On the claim that Stokes was selected for layoff in violation of the
ADEA, we conclude that the record was inadequately developed to
dispose of the issue on a motion for summary judgment. Accordingly,
we vacate and remand that claim for further proceedings.

I

For a 22-year period ending in 1989, Robert A. Stokes worked for
Westinghouse Electric Corporation ("WEC"). In 1989, he was trans-

ferred to work for Westinghouse Savannah River Company ("Westinghouse Savannah"), then a wholly-owned subsidiary of WEC which produced material for the fabrication of nuclear weapons. Westinghouse Savannah managed and operated the Savannah River site in South Carolina under a cost-reimbursement contract with the Department of Energy ("DOE"). At the time of his transfer to Westinghouse Savannah, Stokes qualified for a full pension from WEC payable in an unreduced amount beginning at age 65. With his transfer to Westinghouse Savannah, he also became eligible to earn a Westinghouse Savannah pension.

Following a corporate reorganization of Westinghouse Savannah driven by economic concerns, Stokes was selected for layoff from Westinghouse Savannah in December 1996. At that time, Stokes, who was 56 years old, qualified for a lump-sum severance payment, as well as an actuarially reduced pension, both payable by Westinghouse Savannah. The severance benefit was described in Westinghouse Savannah's employee manual in part as follows:

> The program provides benefits to eligible employees terminated for lack of work. Employees who have attained at least one year of continuous service are eligible for severance pay . . . . An eligible employee with more than 1 year of service receives 1 week's severance pay for each full year of eligible service up to a maximum of 26 weeks.

The terms of the Westinghouse Savannah pension plan provided that Stokes would receive a 90% pension because he was not yet 58 years old, the age at which he would be entitled to a full pension. Thus, at the time of layoff, Stokes was entitled to benefits in the form of a lump-sum severance payment and a 90% pension from Westinghouse Savannah, as well as a full pension from WEC, which was payable when he reached age 65.

In connection with his WEC pension, Stokes was given an option, because he had been laid off, to begin receiving his pension benefits immediately, thus enhancing the value of his full pension with WEC. WEC offered this "special retirement option" only to employees who satisfied age and service requirements.[1] Under a coordinating agree-

_____

**1** In order to receive the special retirement option, an employee had to be 50 or over with 25 or more years of service; 51 or over with 22 or

3

ment between WEC and Westinghouse Savannah, when employees laid off from Westinghouse Savannah qualified for and elected to take the WEC special retirement option, Westinghouse Savannah remitted to WEC the added cost of the special retirement option. Moreover, Westinghouse Savannah adopted a policy under which it reduced employees' severance payments by the amount it remitted to WEC for the cost of the special retirement option. Thus, if a laid-off employee who qualified for the WEC special retirement option elected to take the option, he could not take the severance benefit from Westinghouse Savannah. Likewise, if the qualified employee elected to take the lump-sum severance payment, he could not take the special retirement option from WEC.

The special retirement option program offered by WEC was scheduled to terminate on December 31, 1996. Thus, while Stokes was notified of his layoff before December 31, 1996, the layoff would not become effective until February 1997, after the special retirement option program had expired. To give Stokes and others in his position the opportunity to participate in the special retirement option, Westinghouse Savannah gave Stokes and the others the option to advance their layoff date. In December 1996, it presented them with a form for that purpose, which reads:

> I have been notified that I will be laid off as of February 16, 1997.
>
> I understand that if I am laid off in 1997, I will not be eligible for the special retirement option of the Westinghouse Corporate Pension Plan . . . [and] that if I am laid off prior to January 1, 1997, I will be eligible for this program. Based on the above, I request one of the following options:
>
> A. I request to be laid off as of December 31, 1996. I understand that I will forfeit any pay for the notice period beyond December 31,

_____

more years of service; 52 or over with 19 or more years of service; 53 or over with 16 or more years of service; 54 or over with 13 or more years of service; or 55 or over with 10 or more years of service.

4

1996 . . . . I also understand I will not be eligible for severance pay from [Westinghouse Savannah].

[Space for employee signature]

B. I do not wish to be laid off as of December 31, 1996 and if I am to be laid off, I elect to have that date be February __, 1997. I understand I will be paid regular salary up to that date and be reassigned to the Resource Center. I also understand that I will not be eligible for the special retirement option of the Westinghouse Corporate Pension Plan . . . however, I will be eligible for severance pay from [Westinghouse Savannah].

[Space for employee signature]

Stokes elected option A, which provided him with the immediate benefit of his full WEC pension, without any reduction. In electing this option, however, Stokes forfeited any claim to severance pay. Had Stokes made no election or had he elected option B, he would have worked until February 16, 1997, at which time he would have received a lump-sum severance payment. He also would have qualified for a full WEC pension, with payments beginning at age 65, and a 90% Westinghouse Savannah pension, reduced because he was 56 years old.

Contending that he should have received both the special retirement option and the severance pay, Stokes filed this action on his own behalf and on behalf of 20 other employees. In his complaint, he alleged that the arrangement between WEC and Westinghouse Savannah to adjust accounts for the coordination of WEC's pension obligations and Westinghouse Savannah's severance pay obligations violated both § 406 of ERISA, 29 U.S.C. § 1106, and Westinghouse Savannah's contract with the DOE. He also alleged that the option presented to him amounted to an illegal setoff arrangement that violated § 4 of the ADEA, 29 U.S.C. § 623(l)(2)(A), as amended by the OWBPA, Pub. L. 101-433, 104 Stat. 978 (1990). Finally, he con-

5

tended that age was a determining factor in Westinghouse Savannah's decision to select him for layoff, in violation of § 4 of the ADEA, 29 U.S.C. § 623(a)(1).

Of the 20 potential class members, 8 filed consents to joinder and motions to intervene in the action. Thereafter, both Stokes and Westinghouse Savannah filed motions for summary judgment. By order dated March 25, 1999, the district court denied Stokes' motion for class certification and the others' motions to intervene and granted summary judgment in favor of Westinghouse Savannah. The order includes a statement that "[a] detailed Order setting out the basis for the court's rulings will be forthcoming." Before issuing the "detailed order," however, the district judge died.

This appeal followed.

II

Stokes' appeal raises several issues, all of which we address, but it reduces essentially to two basic points: (1) the manner in which severance pay was set off against pension benefits denied him severance pay in violation of the ADEA, as amended by the OWBPA, in violation of ERISA, and in breach of the contract between Westinghouse Savannah and the DOE; and (2) his selection for layoff as part of the reduction in force was based on age, in violation of the ADEA. We begin with Stokes' claim that he was illegally denied a severance benefit, in violation of the ADEA, ERISA, and the contract between Westinghouse Savannah and the DOE.

A

All employees at Westinghouse Savannah who had more than one year of service were entitled to a severance benefit if they were laid off due to a lack of work. The amount of each employee's benefit was geared directly to the employee's time in service. Thus, when Stokes was laid off, effective February 16, 1997, he was entitled to the maximum severance benefit based on approximately 29 years of service. When Stokes was advised of his layoff, he also qualified for the special retirement option offered by WEC. The special retirement option,

6

if elected, would allow Stokes to begin receiving WEC pension payments immediately, enhancing the value of this pension. But if he elected this option, he would not receive the severance pay to which he was otherwise entitled. Because the special retirement option program was to expire on December 31, 1996 -- before the effective date of the planned reduction in force at Westinghouse Savannah -- Stokes would not, in the ordinary course, qualify for the special retirement option by its terms. In coordination with Westinghouse Savannah, however, WEC permitted him to advance his layoff date to December 31, 1996, so that he could participate in the special retirement option.

Stokes argues that the "either-or" aspect of these benefits -- either the special retirement option or the severance benefit -- forced him, because of his age (over 50), see supra note 1, to choose between two benefits, causing him to lose one, in this case the severance benefit. Laid-off persons under age 50, he argues, received their severance benefit unconditionally and were therefore treated more favorably. Stokes fails to appreciate, however, the implication of the fact that laid-off persons under 50 did not qualify for the special retirement option.

Viewed outside the context of the ADEA, it would appear that Stokes was not treated worse than younger persons. He could have chosen to receive the severance pay, after all, thereby receiving severance benefits under identical terms offered to younger employees laid off in the reduction in force. To the contrary, it would appear that Stokes was treated better than his younger colleagues because he could choose between severance pay and the special retirement option upon his layoff, whereas the younger workers were left with only the less valuable severance benefit. See May v. Shuttle, Inc., 129 F.3d 165, 175 (D.C. Cir. 1997) (per curiam) (concluding that airline employees eligible for retirement who were furloughed and given a choice of a retirement package or a severance payment presented "no evidence that they were treated less favorably than younger employees"), cert. denied, 524 U.S. 927 (1998). An analysis under the ADEA leads to the same conclusion -- that Westinghouse Savannah did not discriminate against Stokes by offering him the "either-or" option.

The ADEA makes it unlawful for an employer

> to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a)(1). The term "compensation, terms, conditions, or privileges of employment" as used in that section is defined to include "all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan." 29 U.S.C.§ 630(l).

While "conditions" of employment regulated by the ADEA thus include the provision of fringe benefits such as life insurance, health insurance, and pensions -- the costs of which are directly linked to age -- the ADEA, which in the first instance prohibits all age-based employment decisions, provides exclusions and conditions that permit employers to maintain certain age-based plans. The ADEA as amended by the OWBPA provides that it is lawful for an employer

> to observe the terms of a bona fide employee benefit plan --
>
> (i)  where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, as permissible under section 1625.10, title 29, Code of Federal Regulations (as in effect on June 22, 1989); or
>
> (ii) that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter.

29 U.S.C. § 623(f)(2)(B)(i) & (ii).

The ADEA as amended by the OWBPA proceeds to address specifically the coordination of severance payments and certain pension benefits when both are triggered by an event unrelated to age. See 29 U.S.C. § 623(l)(2)(A). Thus, the Act addresses the situation in which an employee is laid off for reasons unrelated to age and becomes eli-

8

gible to receive additional pension benefits as well as severance pay, providing that the employer may deduct, i.e., set off, the value of the additional pension benefits from the employee's severance pay without violating the ADEA, so long as the employee remains eligible to receive "an immediate and unreduced pension." Id. In particular, the amended Act provides:

> It shall not be a violation of [the ADEA] solely because following a contingent event unrelated to age --
>
> (i) the value of any retiree health benefits received by an individual eligible for an immediate pension;
>
> (ii) the value of any additional pension benefits that are made available solely as a result of the contingent event unrelated to age and following which the individual is eligible for not less than an immediate and unreduced pension; or
>
> (iii) the values described in both clauses (i) and (ii);
>
> are deducted from severance pay made available as a result of the contingent event unrelated to age.

29 U.S.C. § 623(l)(2)(A).

The balance that Congress attempted to strike in allowing certain pension benefits to be set off against severance payments is illuminated by the discussions in the legislative history of the provision. See S. Rep. No. 101-263, at 22-26, reprinted in 1990 U.S.C.C.A.N. 1509, 1527-32. In the debate regarding whether it is appropriate to allow benefit coordination following contingent events such as shutdowns and layoffs, congressional committees concluded that pension benefits and severance pay serve different purposes and are therefore not fungible. See id. at 22, reprinted in 1990 U.S.C.C.A.N. at 1527. Whereas pension benefits provide "deferred income in the form of a long-term income supplement," severance pay provides "short-term wage replacement to address the acute need of the dislocated employee who is searching for a new job." Id . at 22, reprinted in 1990

9

U.S.C.C.A.N. at 1528. Congress crafted § 623(l)(2)(A)(ii) to allow benefit coordination if additional pension benefits accrue as a result of the age-neutral event that triggers severance pay and if the employee is entitled immediately after layoff to receive an unreduced pension. In such a case, the additional pension benefits and severance pay are analogous and therefore may be appropriately coordinated. Just as severance pay provides short-term wage replacement to provide a bridge to a person's next job, immediate pension benefits provide a bridge to retirement.

In this case, the benefits choice presented to Stokes fully comported with 29 U.S.C. § 623(l)(2)(A)(ii). Stokes was laid off as a result of a reduction in force. His layoff triggered his right to receive either an early and therefore enhanced pension from WEC or a full, lump-sum severance benefit from Westinghouse Savannah, but not both. Under this arrangement, the special pension benefit was, in effect, set off against the severance benefit -- as permitted by the statute, so long as (1) the triggering event for both is an event unrelated to age and (2) the pension is provided on an unreduced basis. See 29 U.S.C. § 623(l)(2)(A)(ii). Both parties agree that the reduction in force was driven by economic considerations**2** and that Stokes' WEC pension benefit, the added value of which was set off against the severance benefit, was not reduced. Indeed, Westinghouse Savannah contends that the value of the pension benefit was increased because the payment schedule was advanced.

Stokes points out that his pension from Westinghouse Savannah, as distinct from his WEC pension, was actuarially reduced, because at the time of his layoff he was 56 years old and entitled to only 90% of his pension under terms of the Westinghouse Savannah plan. This particular benefit, however, was unaffected by either the layoff or the coordination of benefits. Nothing in the ADEA precludes an employer from providing an actuarially reduced pension benefit when the reason for the reduced benefit is an event unrelated to age -- here, the reduction in force. The coordination of benefits in this case placed the severance benefit in juxtaposition with the WEC pension plan, not with the Westinghouse Savannah pension plan.

_____

**2** Stokes does contend, however, that the decision selecting him for layoff was made because of his age, an issue we address below.

10

Accordingly, we conclude that Westinghouse Savannah did not discriminate against Stokes because of his age when it provided him, at the time of his layoff, a choice between the special retirement option and a severance benefit. In reaching this conclusion, we have assumed both that the reduction in force was an economically driven decision and that the selection of Stokes for layoff was unrelated to age. While the parties do not dispute the former assumption, they do dispute the latter -- a question we address below. If Stokes' selection for layoff turns out to have been prompted by his age, he will be entitled to damages, and his benefits will have to be recomputed. Any such finding, however, would not render the benefit plans and their coordination illegal.

B

Stokes contends that the coordinating arrangement between WEC and Westinghouse Savannah -- through which Westinghouse Savannah transferred to WEC the payments that it received from the DOE as reimbursement for severance benefits -- violated § 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1) (prohibiting a plan administrator or a plan fiduciary from transferring to or for the benefit of a party in interest any assets of the plan).

Stokes' contention fails on numerous grounds. First, Stokes demonstrated no specially created trust funds held for the benefit of employees' severance benefits, the transfer of which could have violated § 406 of ERISA. Had he elected to take his severance benefit, he would have been paid from the general funds of Westinghouse Savannah.

Second, because we have concluded that the special retirement option was properly set off against these severance benefits -- pursuant to Stokes' election -- Stokes was not entitled to any severance benefits.

Third, there is no indication that the transfer of money from Westinghouse Savannah to WEC left Westinghouse Savannah with assets of lesser value. If Stokes had elected to receive the severance benefit, Westinghouse Savannah would have paid the DOE reimbursement directly to him. Because Stokes instead elected the alternative benefit

11

provided by WEC, Westinghouse Savannah paid the DOE reimbursement to WEC. In either case, Westinghouse Savannah's funds for other beneficiaries remained the same.

C

Finally, Stokes contends that the cost-reimbursement contract between Westinghouse Savannah and the DOE obligated Westinghouse Savannah to make severance payments to all of its laid-off employees, unconditionally. He seeks to enforce this obligation as a third-party beneficiary of the contract.

The contractual relationship between Westinghouse Savannah and the DOE provided for the management and operation of the Savannah River facility. As part of the contract, the DOE agreed to reimburse Westinghouse Savannah for specified personnel costs, including severance payments made to laid-off employees. The section of the contract that laid out "Allowable Personnel Administration Costs" included a severance-pay provision which provided that "[a]ll non-temporary employees of [Westinghouse Savannah] . . . whose services are no longer required under this contract due to reduction in workforce, shall receive severance pay based upon total service credit earned with the corporation, up to a maximum of 26 weeks." This section of the contract also indicated that this reimbursement was among the personnel costs that were agreed to be "reasonable and reimbursable when incurred in the performance of the contract work." In short, the provision in the contract between Westinghouse Savannah and the DOE referring to severance pay simply represented an agreement that severance payments made by Westinghouse Savannah would be costs that are reimbursable by the DOE. There is no indication in the contract that this provision was intended to create a direct benefit to laid-off employees of Westinghouse Savannah.

South Carolina contract law, which applies to this claim, see Miree v. DeKalb County, 433 U.S. 25, 30 (1977), carries a presumption that an individual who is not a party to a contract may not enforce it. See Touchberry v. City of Florence, 367 S.E.2d 149, 150 (S.C. 1988). This presumption may be overcome, however, by showing that the individual "was intended to be the direct beneficiary of the contract." Id. The contract must be shown to create a "direct, not incidental or

12

consequential, benefit to the third party." <u>Cothran v. Rock Hill</u>, 43 S.E.2d 615, 617 (S.C. 1947).

Reading in context the severance-pay provision, it becomes readily apparent that Westinghouse Savannah's employees are merely incidental beneficiaries of this provision. The contract evinces neither an expressed nor an implied intent on the part of Westinghouse Savannah or the DOE to directly benefit employees at the Savannah River site. Because Stokes is not a third-party beneficiary of the severance-pay provision, he cannot seek to enforce any obligations created by it.

Similarly, policy proclamations issued by the DOE about the contract, declaring that employees at the Savannah River site are entitled to severance payments, do not create rights in employees enforceable against Westinghouse Savannah because Westinghouse Savannah made no promise with respect to such policy statements.

III

Stokes also contends that Westinghouse Savannah selected him for layoff because of his age, in violation of the ADEA, 29 U.S.C. § 623(a)(1). He acknowledges that the company-wide reduction in force was prompted by budget cuts and not age, and he therefore does not challenge the company's decision, <u>per se</u>, to effect a reduction in force. He does, however, contend that Westinghouse Savannah's decision specifically selecting him for layoff was discriminatory.

Stokes sought to prove his ADEA claim through the three-step proof scheme established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). That scheme requires that he establish, by a preponderance of the evidence, a prima facie case of discrimination. <u>See id</u>. at 802. Once he establishes a prima facie case, the burden shifts to Westinghouse Savannah to "rebut the presumption of discrimination" by producing evidence that the employment action in question was taken "for a legitimate, nondiscriminatory reason." <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). Finally, if Westinghouse Savannah meets its burden of production, the presumption raised by the prima facie case is rebutted and"drops from the case," <u>id</u>. at 255 n.10, and Stokes then bears the ultimate burden of

13

proving that he has been the victim of intentional discrimination, see St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

In Mitchell v. Data Gen'l Corp., 12 F.3d 1310 (4th Cir. 1993), we set forth the elements of a prima facie case of age discrimination applicable in the context of a reduction in force where performance was the announced criterion for selection. We stated that an employee must show that, at the time of his layoff, "(1) the employee was protected by the ADEA; (2) he was selected for discharge from a larger group of candidates; (3) he was performing at a level substantially equivalent to the lowest level of those of the group retained; and (4) the process of selection produced a residual work force of persons in the group containing some unprotected persons who were performing at a level lower than that at which he was performing." Id. at 1315 (citing Duke v. Uniroyal, Inc., 928 F.2d 1413, 1418 (4th Cir. 1991)). After we decided Mitchell, the Supreme Court decided O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996), in which it held that replacement of an ADEA plaintiff by a "substantially younger" worker -- not replacement by someone outside the ADEA's protected class -- is the proper formulation of that element in the McDonnell Douglas prima facie case. The Court reasoned that, given that the discrimination prohibited by the ADEA is discrimination because of an individual's age, not because of the individual's membership in a protected class, the fact that one person in the protected class has lost out to another person not in the protected class is irrelevant. The relevant question is whether the person in the protected class has lost out because of his age. See id. at 312. In response to O'Connor, therefore, we modify the Mitchell formulation of a prima facie case of age discrimination, in the context of a reduction in force where performance is the announced basis for selection, to require a showing by the employee that: (1) he was protected by the ADEA; (2) he was selected for discharge from a larger group of candidates; (3) he was performing at a level substantially equivalent to the lowest level of those of the group retained; and (4) the process of selection produced a residual work force including some persons in the group who were substantially younger than him and who were performing at a level lower than that at which he was performing. See id. at 313; see also Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 n.1 (4th Cir. 1996).

14

We now turn to the circumstances before us. It is uncontested that Stokes, at age 56, was a member of the statutorily protected age group, see 29 U.S.C. § 631(a), satisfying the first element of his prima facie case. While it appears that Stokes also satisfied the second element, as he was selected for layoff from a larger group of candidates during Westinghouse Savannah's reduction in force, a fact indicated by the benefits option form that Westinghouse Savannah presented to Stokes, Westinghouse Savannah contests this fact, maintaining that Stokes volunteered to be laid off to obtain benefits. The parties have a more clearly defined disagreement about whether Stokes made out the last two elements of his prima facie case -- whether Stokes showed that he had performed at a level substantially equivalent to the lowest level of those employees in the relevant group who were retained, and whether he demonstrated that that group included employees who were both substantially younger and lower performers than Stokes.

Stokes presented evidence that one project manager who was retained, Samuel Speight, was younger than Stokes and had received lower evaluation scores than had Stokes during the period of 1994-96. Westinghouse Savannah, however, countered with evidence that Speight received a lower evaluation score than Stokes only in 1994, two years before Stokes' layoff, and that at that time Speight was at a different salary grade level than Stokes. Stokes also claims that Westinghouse Savannah retained a younger project manager, Robert Moen, who had a lower evaluation score than Stokes. Westinghouse Savannah notes, however, that Moen was not retained in Stokes' former division.

From our review of the record, it appears that at this stage the evidence in the record is ambiguous or is inadequately developed to resolve this ADEA claim. Unfortunately, Senior Judge Charles E. Simons, Jr., who decided the motions for summary judgment, died before issuing the "detailed order setting out the basis" for his rulings, as he had intended. We therefore conclude that it is necessary to remand this claim to the district court for further development of the record on the issue of whether Stokes' selection for layoff was because of his age in violation of the ADEA, 29 U.S.C. § 623(a)(1). In remanding the case, we do not suggest or limit the nature of further proceedings. The district judge to whom this case is reassigned may

15

limit reconsideration of this claim to rebriefing and reargument, may allow further discovery and renewed motions for summary judgment, may proceed to trial, or may pursue any other appropriate course.

IV

Finally, Stokes argues that the district court abused its discretion (1) in denying class certification, both under 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216 (authorizing class actions in ADEA cases)) and under Federal Rule of Civil Procedure 23 (governing class actions), and (2) in denying the motions of fellow employees to intervene. The applicants for intervention join in the appeal of this issue. These various joinder requests were made to the district court only in connection with the claim that severance payments were illegally set off against the special retirement option. In view of our ruling on this claim, these procedural matters may have become moot. But even if they are not moot, we conclude that the district court did not abuse its discretion.

Stokes sought to represent a class of 20 fellow employees who, he alleged, were similarly situated. Not only can members of so small a class just as well present their own claims, there is ample evidence from which to conclude that their circumstances differed in material respects. For example, a fellow employee, Robert L. Bailey, was 59 years of age, qualifying him for a full pension from Westinghouse Savannah. Stokes on the other hand, at age 56, qualified only for a 90% pension. Stokes' reduced pension formed an important part of his legal argument.

For similar reasons, the district court was well within its discretion in denying the motions for intervention. The applicants for intervention failed to make a sufficient showing that the disposition of this action would "impair or impede" their ability to protect their interests, a showing that would be necessary to justify their intervention as of right under Federal Rule of Civil Procedure 24(a)(2), and the differences in circumstances among the applicants' employment and layoff justify the district court's denial of permissive intervention under Rule 24(b).

16

In short, we affirm in part and vacate in part and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART, VACATED IN PART,</u>
<u>AND REMANDED</u>

17